UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RONALD BOUCHARD,                    )
                                    )
                Plaintiff,          )
                                    )
v.                                  )   Docket No. 1:14-cv-236-NT
                                    )
GENERAL ELECTRIC COMPANY,           )
                                    )
                Defendant.          )

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Defendant General Electric's ("**GE**" or

the "**Defendant**") motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56 as to discrimination claims by its former employee Ronald Bouchard in

violation of the Americans with Disabilities Act (the "**ADA**"), 42 U.S.C. § 12101 *et seq.*

and the Maine Human Rights Act (the "**MHRA**"), 5 M.R.S. § 4551 *et seq.* (ECF No.

31). For the reasons stated below, the motion is **DENIED**.

**BACKGROUND**

At the summary judgment stage, I am obligated to view the facts in the light

most favorable to the non-moving party and make all reasonable inferences in that

party's favor. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). Accordingly,

the following recitation is largely the "Plaintiff's version" of the facts. I have arrived

at these facts through the parties' consolidated statement of material facts, "credited

to the extent that they are either admitted or supported by record citations in

accordance with Local Rule 56, with disputes resolved in favor of the plaintiff as the

nonmovant."[1] *LaFlamme v. Rumford Hosp.*, No. 2:13-cv-460-JDL, 2015 WL 4139478, at *3 (D. Me. July 9, 2015).

## Mr. Bouchard's Position at GE

GE runs a steam and gas turbine component manufacturing facility in Bangor, Maine. Consolidated Statements of Material Facts ¶ 1 ("**SMF**") (ECF No. 35). Mr. Bouchard worked as a tool designer in GE's Bangor facility. SMF ¶ 3. Mr. Bouchard's job duties included designing fixtures used to hold production parts for machines and processes, making gauges to verify those processes, and repairing and modifying tools and machinery. SMF ¶ 4. In the course of this work, Mr. Bouchard routinely operated machinery, including heavy machinery, such as an overhead crane used to load heavy parts into machines. SMF ¶ 7. Mr. Bouchard's position required clear thinking, precision, and analytical skill, as well as some amount of attention and focus. SMF ¶ 5; Bouchard Dep. 44:15-23 (ECF No. 37-1).

## GE Policies

At GE, requests for leaves of absence and reasonable accommodations are handled by the Human Resources Department and the "CARE Management Team." SMF ¶ 8. The GE Bangor CARE Management Team consists of a physician—Dr.

---

[1]    GE closed its motion for summary judgment with a section titled: "Plaintiff may not create genuine issues of material fact by using his errata sheet to change the substance of his deposition testimony." Def.'s Mem. of Law in Supp. of Mot. for Summ. J. 20 ("**Def.'s Mot. for Summ. J.**") (ECF No. 32). In support, GE cites *Bruno v. Town of Framingham*, No. 08-cv-11403-LTS, 2009 WL 4062177, at *1 (D. Mass. Nov. 20, 2009) (citing Fed. R. Civ. P. 30(e)(1)), where the court struck portions of the Plaintiff's errata sheet that were submitted too late and without required explanations. GE has not alleged that Mr. Bouchard's errata sheet was untimely or lacked reasons for his changes. *See* Fed. R. Civ. P. 30(e)(1). Without more explanation, it is not clear what relief GE seeks in raising this issue. Nonetheless, I have looked at the facts both with and without Mr. Bouchard's errata sheet changes, and find that the result would be the same either way.

Howard Jones; a registered nurse—Ms. Cindy Whalen, RN; and a CARE Manager from GE Health Services—Ms. Kathy Skoney. SMF ¶ 39; Smith Dep. 147:8-12 (ECF No. 39-1); Bouchard Dep. Ex. 7 (ECF No. 37-2). The record does not clearly define the exact functions of the HR Department versus the CARE Management Team. It is at least clear, however, that the CARE Management Team maintains employee medical records and is involved when an employee wants to return to work after a period of medical leave.[2] Smith Dep. 147:2-7; 148:2-5.

As a general matter, if a GE employee needs to take a leave of absence due to a non-work related disability, GE will hold that employee's position for a period of twelve months. SMF ¶ 12. If an employee goes on leave due to a work-related injury, GE will hold the employee's position for eighteen months. SMF ¶ 94 (explaining the distinction between leaves of absence for "workers' compensation reasons" versus "non-workers' compensation reasons.").

### Mr. Bouchard's Medical Issues and Leave

Mr. Bouchard began a medical leave of absence from GE in August of 2011 due to kidney and lower back pain. SMF ¶ 21. Mr. Bouchard ultimately had two-thirds of his kidney surgically removed. SMF ¶ 22. He also suffered from disc and nerve

---

[2]     In the Consolidated Statements of Material Facts, GE repeatedly refers to the CARE Management Team as "a third party medical leave administrator contracted by GE." *See, e.g.,* SMF ¶ 15. In its briefing, GE attempts to distance itself from comments made by CARE Management Team members because they were not "decisionmakers, but rather . . . employees of GE's third party vendor medical clinic." Def.'s Mot. for Summ. J. 16. But the record suggests that the CARE Management Team actually played an active role in determining whether Mr. Bouchard could return to work. I also note that the ADA's definition of discrimination includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's . . . employee with a disability to the discrimination prohibited by this subchapter . . . ." 42 U.S.C. § 12112(b)(2).

problems in the areas around his kidney. SMF ¶ 22. Between August of 2011 and September of 2012, Mr. Bouchard was prescribed a variety of medications for his pain, including atenolol, hydrochlorothiazide, Vicodin, oxycodone, Avinza, morphine, and medical marijuana. SMF ¶¶ 31, 32. Mr. Bouchard used some combination of narcotic pain medication and marijuana on a daily basis between August 2011 and January 2015. SMF ¶ 34.

### Statements on Medication from CARE Management Team and GE Personnel

During his leave of absence, Mr. Bouchard had conversations with members of the CARE Management Team about his condition and the medications he was taking. Specifically, Mr. Bouchard testified that he spoke with Nurse Whalen about returning to work, but she told him that he "couldn't come back taking medication." Bouchard Dep. 88:18-22. Mr. Bouchard also testified that he spoke with Dr. Jones about his attempts to get medical clearance to return to work. But, in Mr. Bouchard's words, Dr. Jones told him "that he didn't think that I should worry about getting a note because I was taking medication and I wasn't going to be allowed to return to work taking the medication I'm taking." Bouchard Dep. 114:15-18.

As he approached the end of his twelve-month leave period, Mr. Bouchard spoke to Keith Brangwynne, an Ombudsman at GE, about his concern that "time was running out" on his leave. Bouchard Dep. 160:2-3. Mr. Bouchard testified that Mr. Brangwynne told him: "[W]ow, that's heavy medication you're taking. Yeah, we probably don't want you working." Bouchard Dep. 160:6-8.

On August 3, 2012, Jill Smith from GE's HR Department emailed Dr. Jones from the CARE Management Team regarding the situation with Mr. Bouchard. Ex. 14 to 30(b)(6) Deps. (ECF No. 37-6). Ms. Smith asked Dr. Jones to contact Mr. Bouchard, writing: "I believe he is still taking significant pain medications, which we were not able to accommodate previously."[3] Ex. 14 to 30(b)(6) Deps. She also wrote that Mr. Bouchard "asked how long it would take to get the pain meds/levels out of his system (so that he might be able to attempt to return to work). Again, I asked him if he thought it was realistic/reasonable to consider returning to work, and I don't think he really thinks it is, but is trying to avoid his employment ending."[4] Ex. 14 to 30(b)(6) Deps.

On August 13, 2012, the day he was terminated from GE, Mr. Bouchard spoke to his former manager, Maurice "Moe" Fournier, who was then GE's Manager of Quality Assurance. Bouchard Dep. 153:13-17; May 18, 2015 Fournier Decl. ¶ 1 (ECF

---

[3]     GE qualifies this statement, as Ms. Smith testified that she herself was not aware of any time prior to August 3, 2012 when GE personnel told Mr. Bouchard that the company would not accommodate his pain medication. Smith Dep. 170:7-11. Ms. Smith testified that this idea "may" have come from Mr. Bouchard himself. Smith Dep. 169:12-14. Because at this stage I draw all inferences in the non-moving party's favor, I find that it is also possible that Ms. Smith's understanding that GE did not accommodate Mr. Bouchard's pain medication previously came from someone other than Mr. Bouchard himself.

[4]     Mr. Bouchard asserts that Ms. Smith's email to Dr. Jones "reflects that Mr. Bouchard asked about quitting all his pain medications so he would be allowed to return to his normal duty work." SMF ¶ 101. GE objects to Exhibit 14 as hearsay. Mr. Bouchard counters that this email, written by Ms. Smith from GE's HR department, is an admission of a party opponent. Under Federal Rule of Evidence 801(d)(2)(D), a statement is "not hearsay" if it "is offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Here, Mr. Bouchard offers the statement against GE, and it was made by an employee in GE's HR department. Thus, it is "not hearsay" under Rule 801(d)(2)(D). To the extent the email contains a question from Mr. Bouchard to Ms. Smith, that question is not a "statement" under Federal Rule of Evidence 801(a), and thus is not hearsay under Rule 801(c). *See United States v. Love*, 706 F.3d 832, 840 (7th Cir. 2013).

No. 37-7). Mr. Bouchard explained to Mr. Fournier that he had asked for accommodations, but was told he could not return to work because of his medications. Bouchard Dep. 153:19-23. Mr. Bouchard testified that "Moe specifically told me that we don't want people on the floor taking medication." Bouchard Dep. 153:23-24.

The record includes evidence of the medications Mr. Bouchard was taking and the general requirements of his tool designer position. The record lacks evidence, however—from an expert or otherwise—on whether Mr. Bouchard's medications were incompatible with performing the tool designer job.[5]

**Medical Clearance & Application of GE's "Break in Service" Policy**

In June of 2012, GE Human Resources Manager Megan Danyi reached out to Mr. Bouchard by telephone and letter to remind him of his upcoming twelve-month "break in service" date. SMF ¶ 49. The letter stated, in part:

> Our records indicate that as of August 13, 2012, you will have been out of work for 12 consecutive calendar months as a result of an illness or injury. Your employment status and service credits have been continued since your last day of work on August 12, 2011. This letter is to advise you that, under GE policy, this service continuation will cease and your employment status will terminate on August 13, 2012.
>
> [...]
>
> If you believe you will be able to return to work, either prior to or shortly after the break in service date, either with or without the need for reasonable accommodations, please contact your Care Coordinator or me as soon as possible so we can discuss the Company's ability to provide any necessary reasonable accommodations. Please contact us within the next 10 days to discuss this issue.

---

[5]     It may be that operating heavy machinery and taking pain medications are incompatible, but without record support, that is an inappropriate inferential leap at the summary judgment stage.

SMF ¶ 50.

Following receipt of this letter, Mr. Bouchard contacted Ms. Danyi to request an extension of his leave period. SMF ¶ 52. Ms. Danyi told Mr. Bouchard that GE could extend his leave for a short period of time, *if* he provided medical certification clearing him to return to work on a specific date. SMF ¶ 52. Put differently, GE was not willing to consider any extension of leave, for any length of time, beyond the twelve-month mark without a medically-backed date-certain for return.[6]

After receiving this letter, Mr. Bouchard met with Ms. Danyi and others to discuss his options. SMF ¶ 53. The parties dispute whether Mr. Bouchard indicated at this June 2012 meeting that he was not yet ready to return to work.[7] SMF ¶ 54. The parties do, however, agree that Mr. Bouchard did not at this time have medical clearance from a doctor to return to work, with or without accommodations. SMF ¶ 54.

---

[6]    GE admits the following facts: (1) "Jill Smith told Ron Bouchard that he needed a set date for return to work, and that he couldn't get an accommodation until he had a set date," SMF ¶ 87; and (2) "Megan Danyi told Ron Bouchard that a limited extension of a leave of absence may be possible in cases where a specific return to work date that is close to the 12-month break in service date is provided in advance of the termination." SMF ¶ 99.

[7]    Mr. Bouchard testified as follows on this point:

   Q: Okay. Did you indicate at that meeting that you were ready to return to work? That's just a yes or no.
   A: I don't think so. I may have.
   Q: I don't want the may haves. I'm not trying to interrupt you either.
   A: No. No, I'm sorry.
   Q: Okay.
   A: No.

Bouchard Dep. 142:24-143:6. The record reads as a "no" on the question of whether Mr. Bouchard was ready to return to work in June of 2012. But whether he indicated that he was ready to return to work two months before his break in service does not affect the outcome here.

The parties also agree that Mr. Bouchard *never* obtained medical certification stating that he could return to work with or without reasonable accommodations. SMF ¶ 57. But the parties disagree as to whether Mr. Bouchard was working on getting that certification, if he was, how close he might have been to obtaining it, and further, whether Dr. Jones discouraged him from getting medical certification in the first place. SMF ¶¶ 58; 89, 105. Mr. Bouchard testified as follows on these points:

> Q: You mentioned at the end of your time on leave in August of 2012 after having been out of work for a year from GE, you had bleeding around your kidney; right?
> A: Correct.
> Q: Were you in a position to return to work at that time?
> A: Basically, a conversation that I had with my physician was that if I felt comfortable going back to work, that she would back me.
> Q: But you didn't get that backing; is that correct?
> A: I called Dr. Jones and discussed it with him, and he recommended that I not even go do it, because he felt I was going to need another surgery on my kidney.
> Q: Did your doctor give you a note at that time in August of 2012 to return you back to work?
> A: No.
>
> […]
>
> Q: Okay. What did you believe that GE failed to do for you at that time in August of 2012 that you allege was discriminatory?
> A: Basically, I felt that not—that being allowed more time to clarify what was going on with my kidney, when I hear from other people that there were instances where they were allowing extensions, and also of other employees taking medication at the plant, and me being told that I couldn't return to work because I was taking medication.

Bouchard Dep. 101:10-102:15.

> Q: But the response that you're looking for, which was—what was the response you were looking for?
> A: I was hoping that I could get an extension so I could keep my job.
> Q: I understand.
> A: Okay.

8

Q: Was there anything else that you were looking for in terms of an accommodation?

A: Yeah. I mean, if it was determined that I was going to have to be on medication, I was hoping that I could return to work on medication and prove that I could do my job.

Q: But at no time did you receive a note from a doctor saying that you were ready to attempt to make that proof; isn't that correct?

A: Partially.

Q: Okay.

A: My physician that was my physician at the time knew that I went to see this doctor in Portland and that I only got in there to see him for a couple of minutes. Her and I were under the understanding that if I wanted to return to work, all I needed to do was call her, and if I would take the responsibility or whatever, that she would okay me returning to work.

Q: When you say take the responsibility—

A: That's me putting words in there.

Q: Okay. What do those words mean?

A: Basically if it was comfortable—if I felt comfortable going back to work, that she would back me.

Q: And you never went to get that backing—

A: I called her—oh, I'm sorry.

Q: That's okay. Just let me finish the question. You never went to get that backing until August of 2012 on the eve of your break in service; is that correct?

A: No.

Q: When did you go to get that backing?

A: It was about five days before my termination date.

Bouchard Dep. 166:3-167:22.

A: The day I spoke with Dr. Jones [near the end of the 12-month leave], I put in a call to my primary care physician seeking a doctor's note. And I made Dr. Jones aware of that phone call that I called to try to get a note.

Q: Who did you call?

A: Leah Hebert.

Q: You didn't get a note from Hebert, though, did you?

A: I didn't because she was out of town.

Bouchard Dep. 104:7-14. Mr. Bouchard did not return to work on August 13, 2012; he was terminated from his employment with GE that same day. SMF ¶¶ 70, 71.

9

**Return to Work on a Part-Time Basis**

There is also evidence in the record that Mr. Bouchard inquired about returning to work on a part-time basis. Specifically, he spoke with Nurse Whalen before his break in service date about returning to his tool designer position part-time. Bouchard Dep. 171:12-24. In addition, HR Generalist Jill Smith's notes from a May 30, 2012 telephone conversation with Mr. Bouchard include: "goal to get back to work-back part time?" Smith Dep. 158:9-14; 159:23-160:2; Ex. 8 to 30(b)(6) Deps. (ECF No. 37-6). Mr. Bouchard did not, however, have medical clearance to return to work part-time at the time GE terminated him. Bouchard Dep. 116:24-117:3; 149:3-7; 151:4-7; 152:19-22; 171:25-172:2.

**Hardship for GE**

The parties agree that Mr. Bouchard's absence caused GE to incur overtime costs, outsource or leave unfinished certain production and design work, manage difficult scheduling issues, and absorb lower production levels. SMF ¶ 46.

**LEGAL STANDARD**

Summary judgment is only appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has potential to determine the outcome of the litigation." *Id.*

On a motion for summary judgment, the Court construes the record in the light most favorable to the non-movant and resolves all reasonable inferences in the non-movant's favor. *Id.* "Thus, 'to survive summary judgment a plaintiff is not required to rely only on *uncontradicted* evidence.'" *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)). Instead, "[w]here the record contains inconsistencies 'that favor in some lights the defendants and in others the plaintiff,' as long as the 'plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling.'" *Id.* (quoting *Calero-Cerezo*, 355 F.3d at 19).

## DISCUSSION

Mr. Bouchard presses two distinct claims of discrimination against GE under the ADA and MHRA[8]: (1) intentional discrimination (or "disparate treatment"); and (2) failure to accommodate.[9] First Am. Compl. ¶¶ 9-18 (ECF No. 11). I address whether summary judgment is appropriate as to each claim below.

---

[8]    The First Circuit has observed that "[g]enerally, disability-related claims under the MHRA are 'construed and applied along the same contours as the ADA.'" *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 n.12 (1st Cir. 2013) (quoting *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir. 2003)).

[9]    The Plaintiff's Complaint consists of one count of "Disability Discrimination/Failure to Accommodate." First Am. Compl. ¶¶ 9-18. I follow the parties' lead and treat this count as making out two separate claims of discrimination. *See* Def.'s Mot. for Summ. J. 2; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 4, 8 ("**Pl.'s Opp'n**") (ECF No. 33); *see also Floyd v. Lee*, 968 F. Supp. 2d 308, 315 (D.D.C. 2013) (internal citations and footnote omitted) ("Claims of discrimination under the ADA can take one of four forms: intentional discrimination (or 'disparate treatment'), disparate impact, hostile work environment, and failure to accommodate.").

## I.   Disparate Treatment

To prevail on a disparate treatment claim, an employee must prove "that he (1) has a disability within the meaning of the ADA; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) was subject to an adverse employment action based in whole or part on his disability." *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011). An employee may prove these elements "by presenting direct evidence of discrimination" or "indirectly by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* (quoting *Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 511 (1st Cir. 1996)). Mr. Bouchard proceeds through the *McDonnell Douglas* framework.

> Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must
>
> Offer evidence sufficient to establish that he "(i) has a disability within the meaning of the [ADA]; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the [ADA]; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result."

*Ramos-Echevarria*, 659 F.3d at 186 (quoting *Jacques*, 96 F.3d at 511). If the plaintiff makes this showing, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action." *Id.* at 186-87. If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the employer's reason is actually pretext for discrimination. *Id.* at 187. GE asserts that Mr. Bouchard has failed to raise any triable issues of fact as to: (1) whether Mr. Bouchard was qualified to perform the essential functions of his tool designer job, with or without

reasonable accommodations; and (2) whether GE's stated reason for terminating Mr. Bouchard was pretextual. Def.'s Mem. of Law in Supp. of Mot. for Summ. J. 10-17 ("**Def.'s Mot. for Summ. J.**") (ECF No. 32).

## A.   "Qualified Individual"

GE argues that Mr. Bouchard has failed to establish a genuine issue of material fact as to whether he was qualified to perform his job with or without a reasonable accommodation. Def.'s Mot. for Summ. J. 11-12. Specifically, GE maintains that Mr. Bouchard cannot show he was qualified because he did not have medical clearance to return to work or a physician-endorsed return-to-work date by the end of his one-year leave. Def.'s Mot. for Summ. J. 11-12. Mr. Bouchard counters that comments from the CARE Management Team and GE employees caused him to believe that getting medical clearance would be futile, but that he was nonetheless working on getting medical clearance when he was terminated, he just needed more time to get it. Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. 4, 8. ("**Pl.'s Opp'n**") (ECF No. 33). Mr. Bouchard explains that "had the medical staff not told [him] that he couldn't work while on medications, [he] would have obtained a return to work note from his doctor before his break in service date. The lack of specificity in [his] request for an extension was a direct result of the information he had been given by GE's medical clinic staff." Pl.'s Opp'n 6.

The ADA defines a "qualified individual" as one

> [W]ho, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before

advertising or interviewing applicants for the job, this description shall
be considered evidence of the essential functions of the job.[10]

42 U.S.C. § 12111(8). There are indeed examples of courts granting summary judgment in favor of employers where employees have not obtained medical clearance to return to work and cannot say when they will be able to return. *See* Def.'s Mot. for Summ. J. 11-12 (collecting cases). But none of these cases share the unique facts of this case, and thus do not address how this "qualified individual" analysis should apply where there is evidence that the employer told the employee he could only return to work if he was off all medication.

It is true that employers may make medical inquiries and require medical examinations that are relevant to a returning employee's ability to do the job. *See* 42 U.S.C. § 12112(d)(4)(B); 29 C.F.R. § 1630.14(c); *see also* EEOC Enforcement Guidance: Disability—Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), Job-Related and Consistent with Business Necessity, Part C.17 (July 27, 2000), http://www.eeoc.gov/policy/docs/guidance-inquiries.html. But that right is not limitless—such inquiries must be related to whether the employee can "perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). Considered in the light most favorable to Mr. Bouchard, the record supports an inference that GE required Mr. Bouchard to be off all medications, not just medications that prevented him from performing the essential functions of the tool designer position. Thus, the outcome here may have

---

[10]     The present record does not include information from GE about the essential functions of the tool designer position, just information from Mr. Bouchard himself. *See* SMF ¶¶ 4-7.

14

been different if the record demonstrated that Mr. Bouchard's particular medications prevented him from performing the essential functions of the tool designer position, but at this point, it does not.

Accordingly, accepting for purposes of summary judgment that GE personnel and CARE Management Team members told Mr. Bouchard he could not return to work on medication, I find that the question of whether Mr. Bouchard was "qualified" remains open.

### B.    Pretext

GE maintains that Mr. Bouchard was terminated because he did not return to work after his twelve-month leave, nor could he give a medically-backed date-certain for his return. Def.'s Mot. for Summ. J. 12, 15. But there is enough evidence in the record to create a triable issue of fact as to whether that reason was pretextual.

As described above, Mr. Bouchard has pointed to statements from CARE Management Team members—the individuals tasked, along with HR, with determining whether he could come back to work—that GE did not want him returning to work while on medication.[11] Likewise, there is a statement from Mr. Bouchard's former manager that GE did not want people "on the floor taking medications." Bouchard Dep. 153:23-24. A reasonable jury could find a close enough nexus between being on prescribed medication and being disabled to find that

---

[11]    I do not agree with GE's characterization of these statements, because I find that a jury could view them as more than "isolated, off-hand comments by non-decisionmakers expressing concern for Plaintiff's well-being." Def.'s Mot. for Summ. J. 16. The record suggests that members of the CARE Management Team played an active role in determining whether Mr. Bouchard could return to work. *See* Ex. 14 to 30(b)(6) Deps. (ECF No. 37-6); Smith Dep. 148:2-5; Ex. 25 to Bouchard Dep. (ECF No. 37-2). GE has not identified the actual decision makers(s) responsible for Mr. Bouchard's termination.

discrimination on the basis of taking medication constitutes discrimination on the basis of disability. *See Scruggs v. Berg Spiral Pipe Corp.*, No. 14-339-CG-B, 2015 WL 3830983, at **5-6 (S.D. Ala. June 22, 2015) (denying summary judgment where employer's proffered reason for terminating employee—that his use of muscle relaxers could impair his ability to work in a "safety sensitive environment"—could be pretext for discrimination based on his back condition). Fact issues remain as to whether GE's stated reason for termination—namely, application of its break in service policy—was actually pretext for discrimination based on Mr. Bouchard's disability.

## II.   Failure to Accommodate

In order to make out a failure to accommodate claim under the ADA, a plaintiff must show

> [T]hat he is a qualified individual with a disability within the meaning of the applicable statute; that he works (or worked) for an employer whom the ADA covers; that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999). The parties dispute whether Mr. Bouchard has presented enough evidence to demonstrate that he was a "qualified individual," and if so, whether GE failed to reasonably accommodate his disability.[12]

---

[12]   For the same reasons discussed above with respect to his disability discrimination claim, I find that there is an issue of fact as to whether Mr. Bouchard was a "qualified individual" for purposes of his failure to accommodate claim. I therefore focus here on whether there are material issues of fact as to whether GE failed to reasonably accommodate Mr. Bouchard.

Failure to accommodate claims under the ADA require "difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes." *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 650 (1st Cir. 2000). It is thus unsurprising that at least one district court has observed that "[t]he issue of whether an accommodation is reasonable is normally a question of fact, unsuited for a determination on summary judgment." *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 367 (E.D.N.Y. 2012). This case is no exception. Summary judgment in favor of GE would only be appropriate if I ignored the First Circuit's instructions and applied per se rules.

GE requests that I apply the per se rule that a request for "indefinite" leave cannot be a reasonable accommodation. Def.'s Mot. for Summ. J. 17-18. GE urges that Mr. Bouchard's request to extend his leave was "indefinite" because he did not couple it with a physician-backed return-to-work date. Def.'s Mot. for Summ. J. 18. The case law generally lines up on that basis—namely, whether the plaintiff asked for a specific extension versus an open-ended one. *Compare, e.g.*, *Henry v. United Bank*, 686 F.3d 50, 60-61 (1st Cir. 2012) (affirming summary judgment under the Massachusetts analogue to the ADA where, at her date of termination, employee could not work or provide a relative timeframe for her return), *with Garcia-Ayala*, 212 F.3d at 648 (reversing grant of summary judgment where employee requested a finite leave extension). But applying that binary would not account for the factual nuances in this case—namely, statements from CARE Management Team members and GE personnel regarding Mr. Bouchard's medications.

As discussed above, there is evidence in the record that GE personnel and CARE Management Team members told Mr. Bouchard he could not return to work on medication. A reasonable jury could find that Mr. Bouchard believed he had to be medication-free before he could resume work for GE. GE admits that it would not discuss any reasonable accommodation with Mr. Bouchard without a physician-backed return-to-work date. The medication issue thus created an additional hurdle for Mr. Bouchard before GE would even discuss a leave extension. I cannot say, as a matter of law, that GE reasonably accommodated Mr. Bouchard where there is evidence that it would not discuss accommodation until he produced a medically-backed date-certain for a medication-free return to work.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant GE's motion for summary judgment (ECF No. 31).


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 17th day of November, 2015.